[Cite as *In re M.H.*, 2018-Ohio-4848.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 105742**

---

**IN RE: M.H.**
**A Minor Child**

[Appeal by State of Ohio]

---

**JUDGMENT:**
REVERSED AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL-16105732

**BEFORE:** McCormack, P.J., Jones, J., and Keough, J.

**RELEASED AND JOURNALIZED:** December 6, 2018

**ATTORNEYS FOR APPELLANT**

Michael C. O'Malley
Cuyahoga County Prosecutor

Joanna N. Lopez
Anthony Thomas Miranda
Assistant County Prosecutors
1200 Ontario Street, 8th Floor
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEE**

Mark A. Stanton
Cuyahoga County Public Defender

Paul Kuzmins
Assistant Public Defender
310 Lakeside Ave., Ste. 200
Cleveland, OH 44113


TIM McCORMACK, J.:

{¶1} Plaintiff-appellant state of Ohio appeals from the judgment of the Cuyahoga County Court of Common Pleas granting defendant-appellee M.H.'s motion to suppress his statements made to a social worker who was employed with the Cuyahoga County Department of Children and Family Services ("CCDCFS"). For the reasons that follow, we reverse the decision of the trial court and remand the matter for further proceedings.

{¶2} On August 24, 2016, M.H. was charged in a delinquency complaint with one count of rape in violation of R.C. 2907.02(A)(2). The charge stems from an incident that

occurred on or about August 18, 2015. At the time of the alleged rape, M.H. was 13 years old and the alleged victim was 12 years old.[1]

{¶3} In response to a referral to the CCDCFS regarding the alleged rape, a social worker from the CCDCFS interviewed M.H., the alleged perpetrator on December 2, 2015. During this interview, M.H. made certain admissions. On March 14, 2017, the state filed a motion in limine to use M.H.'s admissions to the social worker. Thereafter, M.H. filed a motion to suppress his statements, arguing the statements were "barely probative" and would cause significant confusion and delay. He also argued that the statements were obtained in violation of both due process and his right against self-incrimination. In its opposition, the state asserted that M.H.'s statements are relevant, probative, and not unfairly prejudicial. The state also offered that M.H.'s statements were voluntarily made and the rights afforded by the Fifth Amendment do not apply here because M.H. was not in a custodial interrogation.

{¶4} On April 6, 2017, the court held a suppression hearing, during which the following individuals testified: M.H.'s mother; Esther Bradley, the social worker; and Christina Cottom, a Cleveland police detective.

{¶5} M.H.'s mother testified that she received a letter at home sometime between October and November 2015 from Esther Bradley, a social worker with CCDCFS, requesting she bring M.H. to the Jane Edna Hunter Building for an interview. In response, M.H.'s mother

---

[1] We note that the record in this case includes conflicting information concerning M.H.'s birthdate, specifically the birth year. The complaint and various pleadings filed by both M.H.'s trial counsel and the prosecutor identify M.H.'s birthdate as June 26, 2001. The complaint, however, which was filed in August 2016, also identifies M.H.'s age as 14 years at the time the complaint was filed, which would place his birth year at 2002 and his age at the time of the alleged offense in August 2015 at 13 years. Additionally, the juvenile court's intake fact sheet, home detention report, and the warrant identify M.H.'s birthdate as June 26, 2002. Moreover, M.H.'s mother testified at the suppression hearing held in April 2017 that her son was 14 years old at the time of the hearing, which places M.H.'s birth year at 2002. Using June 26, 2002, as the correct birthdate, M.H. would have been 13 years old at the time of the alleged incident that occurred in August 2015.

phoned Bradley, who confirmed the time and place of the interview. She stated that Bradley did not tell her the reason for the interview, but M.H.'s mother had her "suspicions," stating that she "knew the situation that was going on." M.H.'s mother brought M.H. to the interview at the scheduled time and place. The mother testified that Bradley met them in the lobby and advised her that Bradley would be taking M.H. to a different location for a private interview. M.H.'s mother never asked to be present for her son's interview, nor did she advise Bradley that M.H. was not permitted to be interviewed without her. The mother stated that M.H. never asked for his mother to accompany him. She testified that M.H. was in the private room with Bradley for approximately 40 minutes.

{¶6} Esther Bradley is a child protection specialist in the Sexual Abuse Unit of the CCDCFS. She conducts child sexual abuse investigations based upon referrals made to the agency. Bradley testified that her role in this position is to "ensure safety" and ensure that "families and individuals receive services that they need regarding any issues that the family or the individual may be having."

{¶7} Bradley testified that she went to M.H.'s home in October 2015 to complete a home assessment; however, she found no one home. She left a letter informing M.H.'s mother who she is, that M.H. "had been named as an alleged perpetrator in an open sex abuse investigation," and that she needed to speak to M.H. regarding the allegations. Bradley stated that the letter was "very general" and noted that the recipient may call the department "if they choose to."

{¶8} When M.H.'s mother did, in fact, phone Bradley on December 1, 2015, Bradley advised M.H.'s mother of the allegations against M.H. Bradley testified that she "extended an opportunity to see if [M.H.'s mother] would allow [her] to interview [M.H.]." Bradley

informed the mother that the interview with M.H. would be private.  Bradley testified that it is common for parents of alleged perpetrators to tell Bradley that they do not want to meet with her upon learning that the interview would be private; however, M.H.'s mother did not voice an objection at that time to the private interview.

{¶9}  On December 2, 2015, M.H.'s mother brought M.H. to the Jane Edna Hunter Building where Bradley interviewed M.H. for approximately 40 minutes.  Bradley testified that she did not believe she informed M.H. about the nature of the interview, and she never told M.H. that he could leave at any time.  She also stated that M.H. never told her that he did not wish to speak with her, nor did M.H.'s mother tell Bradley that she wished to be in the room with her son.  Bradley stated that there was no police presence at the interview; there was no police interaction with M.H. or Bradley at the time of the interview; the interview room had windows; the door to the interview room was not locked; and there were no restraints.

{¶10} Bradley testified that her purpose for interviewing M.H. was twofold:  to determine whether any inappropriate sexual behavior occurred between M.H. and the alleged victim and to ensure the safety of the alleged victim.  Bradley explained that because M.H. and the alleged victim are considered family, she needed to determine whether a safety plan, "or something of that nature," was required to ensure that "nothing else inappropriate happens."[2]

{¶11} Bradley began the interview with M.H. by asking general questions, building up to the purpose of her interview.  When she asked M.H. if he was sexually active, M.H. disclosed that he was sexually active and his only sexual partner was the alleged victim, whom he

---

[2]  The record demonstrates that M.H.'s mother's boyfriend is the father of the victim and is also the father of M.H.'s half-sister.  M.H. lives with his mother and her boyfriend (along with M.H.'s other siblings), and the alleged victim often visited their home where her father resided.  M.H. refers to the alleged victim as his half-sister.

identified as his half-sister. M.H. told Bradley that they had sex when the alleged victim spent the night at his house.

{¶12} After the interview, Bradley advised M.H.'s mother of M.H.'s disclosures and informed her that Bradley would be making a referral to the OhioGuidestone PROTECT program. Bradley then prepared a report based upon her interview with M.H. and provided the report to her supervisor as well as Detective Cottom. Bradley explained that she is required to share her information with law enforcement. Because a police report had previously been made by the alleged victim, Bradley was aware that Detective Cottom had been assigned the case.

{¶13} Detective Cottom is a detective in the Sex Crimes Unit of the Cleveland police department, whose role is conducting follow-up investigations to reports of child abuse or child sexual abuse. Detective Cottom testified that she was assigned to M.H.'s case on October 20, 2015, regarding an incident that occurred in August 2015. On December 4, 2015, the detective reached out to CCDCFS to determine in what stage the social worker was with the case. Detective Cottom stated that typically the police and the agency attempt to conduct joint interviews of the victim. In this case, however, because the police report was not made until months after the incident, the social worker had already interviewed the victim. And because the interview with M.H. had already been conducted, Detective Cottom did not separately interview M.H. The detective therefore requested Bradley's written report, through a December 4, 2015 voicemail message left for Bradley. The detective received the report on December 17, 2015. Detective Cottom testified that she and Bradley never spoke concerning the case, and the detective did not instruct Bradley as to how to conduct the interview with M.H. or what questions to ask. The detective stated that she was not aware of M.H.'s interview until

after Bradley completed the interview.  Detective Cottom included Bradley's report in the "juvenile package."   On August 24, 2016, M.H. was formally charged.

{¶14} Immediately after hearing the testimony, the trial court granted M.H.'s motion to suppress his statements to the social worker "in light of the child's due process, Constitutional guarantees, [and] Evid.R. 403(A)."   The court stated that "the relationship between [CCDCFS and] the state [is] a little close for comfort."

{¶15} The state now appeals the trial court's decision, asserting that the trial court erred in suppressing M.H.'s statements to the social worker because the interview did not constitute a custodial interrogation and the social worker was not acting as an agent of law enforcement.

{¶16} This court reviews a trial court's ruling on a motion to suppress under a mixed standard of review that involves questions of law and fact.   *Cleveland v. Giering*, 2017-Ohio-8059, 98 N.E.3d 1131, ¶ 12 (8th Dist.), citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.   In a motion to suppress, "the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility."   *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994).   The reviewing court must therefore accept the trial court's findings of fact in ruling on a motion to suppress if the findings are supported by competent, credible evidence.   *Giering*; *Burnside*. The reviewing court, however, must independently determine whether those facts satisfy the applicable legal standard.   *Id.*

{¶17} The Fifth Amendment to the United States Constitution provides that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself * * *."   *State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, 991 N.E.2d 1116, ¶ 19.   Pursuant to *Miranda v. Arizona*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming

from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.E.2d 694 (1966).

{¶18} Under *Miranda*, law enforcement officers and their agents must inform a suspect that: (1) he has the right to remain silent; (2) his statements may be used against him at trial; (3) he has the right to have an attorney present during questioning; and (4) if he cannot afford an attorney, one will be appointed. *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶67, citing *Miranda* at 478-479. "Once an accused invokes his right to counsel, all further custodial interrogation must cease and may not be resumed in the absence of counsel unless the accused thereafter effects a valid waiver or himself renews communication with the police." *State v. Knuckles*, 65 Ohio St.3d 494, 605 N.E.2d 54 (1992), paragraph one of the syllabus.

{¶19} *Miranda* warnings are required only when a suspect is subjected to custodial interrogation. *State v. Jones*, 8th Dist. Cuyahoga No. 83481, 2004-Ohio-5205, ¶ 39. "Custodial interrogation" is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444. The *Miranda* requirements do not apply when admissions are made to persons who are not law enforcement officers or their agents, even if an individual's efforts aid in law enforcement. *State v. Jackson*, Slip Opinion No. 2018-Ohio-2169, ¶ 15, citing *State v. Watson*, 28 Ohio St.2d 15, 271 N.E.2d 153 (1971), and *State v. Bolan*, 27 Ohio St.2d 15, 271 N.E.2d 839 (1971).

{¶20} When determining whether an individual is in custody for *Miranda* purposes, we must consider whether there was a formal arrest or the functional equivalent of "a restraint of an

individual's freedom of movement commensurate with that of a formal arrest." *Jones* at ¶ 39, citing *Miranda*. In so doing, we examine the totality of the circumstances and how a reasonable person would have understood the circumstances. *State v. Montague*, 8th Dist. Cuyahoga No. 97958, 2012-Ohio-4285, ¶ 8, citing *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

{¶21} Generally, courts have held that social workers do not have a duty to advise suspects of their *Miranda* rights because they are private citizens with no power to arrest. *Jones* at ¶ 40; *State v. Coonrod*, 12th Dist. Fayette No. CA2009-08-013, 2010-Ohio-1102, ¶ 9; *State v. Thoman*, 10th Dist. Franklin No. 04AP-787, 2005-Ohio-898, ¶ 7; *State v. Dobies*, 11th Dist. Lake No. 91-L-123, 1992 Ohio App. LEXIS 6361 (Dec. 18, 1992); *State v. Simpson*, 4th Dist. Ross No. 1706, 1992 Ohio App. LEXIS 818 (Feb. 21, 1992).

{¶22} Where, however, the social worker performs as an agent of law enforcement, the social worker may be required to provide *Miranda* warnings. *Jones*, 8th Dist. Cuyahoga No. 83481, 2004-Ohio-5205, citing *State v. Evans*, 144 Ohio App.3d 539, 760 N.E.2d 909 (1st Dist.2001), citing *Watson*, 28 Ohio St.2d 15, 26, 275 N.E.2d 153. A social worker is an agent of law enforcement where the social worker acts under the direction or control of law enforcement. *Bolan*, 27 Ohio St.2d at 18, 271 N.E.2d 839. "'[W]hether someone is acting as an agent of law enforcement is dependent upon the unique circumstances of each case.'" *Jackson*, Slip Opinion No. 2018-Ohio-2169, at ¶ 17, quoting *State v. Bernard*, 31 So.3d 1025, 1033 (La.2010).

{¶23} Nevertheless, the "ultimate inquiry" is whether the suspect was in custody at the time of the interrogation, i.e. "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S.

1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Jones* at ¶ 40.

{¶24} In considering whether an individual is in custody for *Miranda* purposes, "courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 27, citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

{¶25} In resolving the issue of custody, courts consider certain factors relevant to this determination: (1) the location of the questioning; (2) the duration of the questioning; (3) statements made during the interview; (4) the presence or absence of physical restraints; and (5) whether the individual was released at the end of the interview. *Howes v. Fields*, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012); *In re J.S.*, 3d Dist. Marion No. 9-15-26, 2016-Ohio-255, ¶ 13. Moreover, a juvenile's age may be considered for purposes of *Miranda*, "so long as the juvenile's age was known to the officer at the time of questioning or would have been objectively apparent to a reasonable officer." *In re R.S.*, 3d Dist. Paulding No. 11-13-10, 2014-Ohio-3543, ¶ 18, citing *J.D.B. v. North Carolina*, 564 U.S. 261, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011). However, "[w]hile 'a juvenile's age may be considered in the *Miranda* custody analysis, the Supreme Court cautioned that 'this does not mean that a child's age will be a determinative, or even a significant, factor in every case * * *.'" *Id.*, quoting *J.D.B.* at syllabus.

{¶26} The state contends that M.H. was not subjected to a custodial interrogation because the social worker conducting the interview was not acting as an agent of law enforcement and M.H. was not in custody when he was interviewed by the social worker. The state argues,

therefore, that the trial court erred in suppressing M.H.'s statements. While we find, as did the trial court, the totality of the circumstances of this case troubling, we are constrained to find that M.H. was not subjected to a custodial interrogation as contemplated by *Miranda*.

{¶27} We first address the question whether Esther Bradley, the social worker, was an agent of law enforcement. In light of the case law in Ohio, including the Ohio Supreme Court's recent decision concerning a social worker's duty in child abuse investigations, as well as the record in this case, we must answer this question in the negative.

{¶28} In *Jackson*, *supra*, the Ohio Supreme Court held that a social worker's statutory duty to cooperate and share information with law enforcement with respect to a child abuse investigation does not render the social worker an agent of law enforcement for purposes of the Fifth and Sixth Amendments to the United States Constitution when the social worker interviews an alleged perpetrator unless other evidence demonstrates that the social worker acted at the direction or under the control of law enforcement. Slip Opinion No. 2018-Ohio-2169, at syllabus. The Supreme Court determined that although the children services agency is statutorily obligated to cooperate with and provide information to law enforcement regarding child abuse investigations, the statute "does not mandate that agency employees interview alleged perpetrators of child abuse at the direction or under the control of law enforcement." *Jackson*, Slip Opinion No. 2018-Ohio-2169, at ¶ 21. The Court then concluded that the social worker in *Jackson* did not act as an agent of law enforcement when interviewing the defendant where: the only evidence of contact between the social worker and law enforcement about the investigation was testimony that the social worker contacted law enforcement to coordinate a joint interview of the victim; there was no evidence that law enforcement asked the social worker to interview

the defendant; and there was no evidence that law enforcement influenced the social worker's interview of the defendant in any way. *Id.* at ¶ 23.

{¶29} Here, the record demonstrates that Bradley performed her customary duties as a child protection specialist with CCDCFS. Bradley testified that she conducts child sexual abuse investigations based upon referrals made to the agency. She stated that her role in sexual abuse investigations is to ensure the safety of the children and ensure that individuals and families receive any services they may need. Specifically, she testified that her purpose for interviewing M.H. was to investigate the abuse allegations as well as to ensure the victim's safety. Bradley explained that in this case, the alleged perpetrator and the alleged victim were considered family, because M.H. and his mother lived with the alleged victim's father with whom the alleged victim often visited, and a familial relationship could necessitate a need for a safety plan.

{¶30} Thus, in this case, Bradley received a referral concerning child sexual abuse allegations that named M.H. as the alleged perpetrator, and she went to M.H.'s home to investigate. Bradley then conducted her interview of M.H. to determine whether any inappropriate sexual behavior occurred and whether a safety plan was required. The fact that M.H. was the subject of the investigation "'does not trigger the need for *Miranda* warnings in a noncustodial setting.'" *State v. Smith*, 10th Dist. Franklin No. 96APA10-1281, 1997 Ohio App. LEXIS 2426, 7 (June 3, 1997), quoting *Minnesota v. Murphy*, 465 U.S. 420, 431, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

{¶31} We are troubled by a social worker's typically close working relationship with law enforcement, where a child-abuse investigation seemingly moves along an official conveyor belt — from interview to sharing the findings with police to an arrest. And in this case, that is exactly what happened. However, as the Ohio Supreme Court recently declared, this duty to

report did not make Bradley an agent of law enforcement for *Miranda* purposes. *Jackson,* Slip Opinion No. 2018-Ohio-2169, at syllabus. In considering the record in this case, along with Bradley's duty, we find there is no evidence that law enforcement requested the interview, provided instructions to Bradley on how to conduct the interview or what questions to ask M.H., or influence the interview in any way. In fact, the detective assigned to the case testified that she never actually spoke with Bradley regarding this case, leaving only a voicemail requesting a copy of the social worker's report. And although the detective and the social worker typically conduct joint interviews of the victim, Detective Cottom testified that Bradley had conducted the interview independently by the time the detective had contacted Bradley. We therefore find that in interviewing M.H. and reporting her findings to law enforcement, Bradley was not acting under the direction or control of the police, but rather, she was performing her customary duties as a child protection specialist. *See Coonrod*, 12th Dist. Fayette No. CA2009-08-013, 2010-Ohio-1102, at ¶ 12.

{¶32} Next, we consider whether M.H. was in custody at the time of the interview. In reviewing the relevant factors outlined above, we note that M.H. was only 13 years old at the time he was interviewed. Although we recognize there is no evidence that M.H. asked why he was brought to the social services center, became confused, contested to being there, or behaved immaturely or in a manner demonstrating he was not able to comprehend what was being said to him, we question how any child of this young age could understand or appreciate the circumstances. Equally troubling is the fact that M.H.'s mother likely felt compelled to respond to the social worker's "request" and did not fully appreciate that she could, in fact, refuse to deliver M.H. to Bradley as requested in the letter or sit in on the interview.

**{¶33}** We note, however, that the majority of the factors weigh against a finding that M.H. was in custody. First, no charges had been filed and M.H. was not under arrest. M.H.'s mother brought M.H. to the social services center in response to the social worker's letter requesting an interview; M.H. was not ordered to appear at the police station. M.H. was also free to leave the building after the interview. *See In re T.W.*, 3d Dist. Marion No. 9-10-63, 2012-Ohio-2361, ¶ 30 (factor weighing against finding custody is that juvenile was not escorted by a police officer); *Jones,* 8th Dist. Cuyahoga No. 83481, 2004-Ohio-5205, at ¶ 41, citing *Oregon*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (holding that defendant was not in custody if he voluntarily appeared for questioning and was free to leave afterward).

**{¶34}** Additionally, the interview, which lasted 40 minutes, was conducted in a private room at the social services center while M.H.'s mother waited in the lobby. *In re B.J.*, 11th Dist. Lake No. 2013-L-091, 2014-Ohio-5701, ¶ 19 (finding the interview of approximately 30 minutes "a short duration"); *In re T.W.* at ¶ 30 (finding parents waiting in lobby during interview, suggesting the interview would be brief). The interview did not occur at the police station, nor was there any direct police involvement or police presence at any time during the interview. *See In re D.B.*, 10th Dist. Franklin Nos. 17AP-83 and 17AP-85, 2018-Ohio-1247, ¶ 26 (factors suggesting no custodial interrogation include the interview being conducted at a social services station rather than a police station, an unlocked room, and the juvenile leaves with his parent). Bradley was the only adult present during the interview. The door to the interview room was closed but not locked, the room had windows, and M.H. was not physically restrained. M.H. never told the social worker that he did not wish to speak with her or express reluctance or hesitation in answering Bradley's questions. Finally, there is no evidence of overt intimidation or coercion exerted over M.H. at any point that day.

**{¶35}** Accordingly, under the dictates of the current law in Ohio and the totality of the circumstances in this case, we find the record establishes that the child protection specialist was conducting her customary duties as an investigator for CCDCFS, and there is no evidence that she was acting under the direction or control of law enforcement when she interviewed M.H., despite her cooperation with law enforcement. Additionally, we find that M.H. was not restrained, and a reasonable juvenile in his circumstances would have felt free to leave the interview. Thus, M.H. was not in custody or otherwise deprived of his freedom of action in any significant way at the time he made the incriminating statements. The trial court therefore erred in determining that M.H.'s statements should have been suppressed because M.H. was not informed of his *Miranda* rights prior to being questioned.

**{¶36}** M.H. contends that even if this court does not find a violation of *Miranda*, M.H.'s statements were obtained in violation of the due process clause and Evid.R. 403, asserting that M.H.'s statements were not freely or voluntarily made, and they are prejudicial because the admission of the statements would cause significant confusion and delay. M.H. further argues that because the state failed to address these arguments, this court should affirm the trial court's decision granting the motion to suppress. We find no merit to this argument.

**{¶37}** Following the suppression hearing, the trial court granted the defense motion, stating that it granted the motion to suppress "in light of the child's due process, Constitutional guarantees, [and] Evid.R. 403(A) * * *." However, the transcript reveals that immediately after its ruling, the trial court explained that the relationship between CCDCFS and the state was "a little close for comfort," thus suggesting that the social worker was acting as an agent of law enforcement when she interviewed M.H. We therefore find the trial court reasoned that M.H.'s statements were obtained in violation of *Miranda*.

**{¶38}** Nevertheless, even if we do not find that the court's statement was the basis for the trial court's decision, we likewise do not find that M.H.'s statements were otherwise improperly obtained.

**{¶39}** First, we do not find the statements were obtained in violation of M.H.'s due process rights. Whether a defendant made a statement voluntarily and whether the defendant voluntarily, knowingly, and intelligently waived his right to counsel and against self-incrimination are separate and distinct issues. *See State v. Dennis*, 79 Ohio St.3d 421, 425, 683 N.E.2d 1096 (1997); *State v. Chase*, 55 Ohio St.2d 237, 246, 378 N.E.2d 1064 (1978). "'The Due Process Clause requires an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession.'" *State v. Johnson*, 12th Dist. Warren No. CA2015-09-086, 2016-Ohio-7266, ¶ 76, quoting *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 10. Both issues, however, are measured under the totality of the circumstances. *Dennis* at 425. Under this standard, a court should consider "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

**{¶40}** For reasons similar to those discussed above, we conclude that M.H.'s statements were not involuntary. Here, M.H. was brought to the social services center by his mother, where he was interviewed by a social worker. The interview, which was conducted solely by the social worker, was relatively brief, lasting 40 minutes, and lacked any direct police presence. There is no evidence — or allegations — of any threats, coercion, suggestions, restraints, or

physical deprivation or harm to M.H. Nor is there evidence that M.H. told the social worker that he did not wish to speak to her or that he conducted himself in a manner suggesting he did not wish to be interviewed. M.H. provided his statement in answer to Bradley's question regarding whether he was "sexually active." Given the circumstances, we find the evidence demonstrates that M.H.'s will was not overcome by the circumstances surrounding the giving of his statements to the social worker.

{¶41} Secondly, we do not find the record supports M.H.'s generic contention that his statements are "more prejudicial than probative" in violation of Evid.R. 403. Evid.R. 401 provides that relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 403(A) states that, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶42} In his motion to suppress, M.H. argues, without explanation or support, that his statements are "barely probative" and would cause significant confusion and delay "in these already arduous proceedings." An admission that he had sex with his 12-year-old "half-sister" is clearly relevant to the social worker's investigation into allegations that M.H. did indeed engage in inappropriate sexual conduct with an individual under 13 years of age. His admission is likewise probative of the allegations. However, M.H. has failed to demonstrate how his statements are *unfairly* prejudicial or how his admission would cause confusion or delay. Moreover, we find nothing in the record supporting his argument.

{¶43} The state's sole assignment of error is sustained.

{¶44} Judgment reversed and remanded for proceedings consistent with this opinion.

It is ordered that appellant recover of said appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., CONCURS (WITH SEPARATE OPINION ATTACHED);
LARRY A. JONES, SR., J., DISSENTS (WITH SEPARATE OPINION ATTACHED)


KATHLEEN ANN KEOUGH, J., CONCURRING:

{¶45} Based on the testimony provided at the suppression hearing, it is clear that the social worker interviewed M.H. during the normal course of her investigation and not at the request or direction of law enforcement. These facts put this case squarely within the Ohio Supreme Court's holding in *Jackson*. Accordingly, I must concur with the lead opinion and agree with the lead opinion's concerns regarding the relationship between the social worker and law enforcement, and the lack of understanding M.H. and his mother demonstrated regarding the interview process with the social worker.

{¶46} I feel compelled, however, to write separately because this case involves a 13-year-old juvenile who was interviewed outside the presence of his mother. My concern in this case falls on the role of the social worker and what information should be provided to the parent or guardian of a child suspected of child abuse. In this case, the social worker testified

that she told M.H.'s mother that the interview would be "private." According to the social worker, this advisement was the mother's opportunity to decide whether to bring M.H. to the interview knowing that it would be conducted without a parent or guardian present. To me, the word "private" indicates that the nature and substance of the interview would not be shared. I believe this was the mother's understanding and find that a reasonable person in mother's situation would not have understood the circumstances surrounding the interview.

{¶47} M.H.'s mother stated that she did not know that the meeting with the social worker was voluntary and she did not ask to be present during the interview because she thought it was not permissible. Although mother stated that she had suspicions about what the interview was about, she further stated that had she known about the purpose and nature of the meeting, and potential consequences, she would have had an attorney present.

{¶48} The record is clear that at no time was mother apprised that the interview was voluntary, she could request to be present, or have any attorney present. She did not understand that the statements her son made could be used against him or would be provided to law enforcement. In fact, the social worker admitted that she kept the information given to mother "very general."

{¶49} Additionally, the social worker admitted that at no time did she advise M.H. of the purpose for the interview, that the interview was voluntary, he was free to leave, and the information he shared would be not be private, but shared with law enforcement. According to the social worker, she did not have to advise M.H. of any rights or this additional information because she is not law enforcement. I believe that because the social worker was a former seasoned law enforcement officer, she understood the legal consequences of the interview, admissions the child made, and information that was necessary to assist in a criminal

investigation. Despite the fact that the social worker initially testified that the investigation and interview is to ensure the "safety of the victim," she subsequently stated that her purpose when interviewing M.H. was "to determine whether or not some type of inappropriate sexual behavior happened between the two of them and if anything criminal happened, then I pass that on to law enforcement." (Tr. 64.) Based on that answer, the social worker was asked to explain how "interviewing M.H. has to do at all, if at all, with the safety of the victim?" Therefore, it is questionable if victim safety was her primary concern.

{¶50} I can appreciate the trial court's position that the role of the CCDCFS social worker and law enforcement is "a little close for comfort" in these circumstances. While the law protects CCDCFS records as confidential, thus arguably not subject to discovery by the defense, the law allows the records to be shared with law enforcement and included in the "juvenile package" that is presented to the prosecutor to determine whether a complaint should be brought against the juvenile. These reports contain statements made by the juvenile who was not *Mirandized*, and whose interview was not recorded. Absolutely no procedural safeguards are in place during this "non-custodial, but yet, your words will be used against you" interrogation.

{¶51} I am troubled by the circumstances of this case and see potential abuse by law enforcement when handling these types of cases when juveniles are the alleged perpetrators. I feel that the holding in *Jackson* allows law enforcement to sit on their hands and not conduct their own investigation when an allegation of child abuse occurs because they know that CCDCFS will interview the juvenile and provide a copy of their report to law enforcement. The *Jackson* holding makes it clear that as long as law enforcement keeps an arm length's distance from CCDCFS during its investigative stage, then the social worker will not be classified as law

enforcement; thus, no constitutional safeguards need to be implemented to protect an alleged perpetrator's rights.

{¶52} My concern is evidenced by the facts in this case that although Detective Cottom was assigned to investigate the allegation of abuse on October 20, 2015, she did not have any contact with CCDCFS until December 4, 2015 (conveniently two days after M.H.'s interview with the social worker) when she left a message on the social worker's voicemail requesting her write-up on the case. As Detective Cottom admitted, she did not have to interview M.H. because "it had already been done" by the social worker at CCDCFS. (Tr. 75.) That, to me, leaves me no doubt that law enforcement use social workers as their agents to obtain information that they otherwise would not be able to obtain so freely.


LARRY A. JONES, SR., J., DISSENTING:

{¶53} Respectfully, I dissent. I would affirm the trial court's judgment suppressing statements M.H. made to the CCDCFS social worker.

{¶54} While the majority opinion finds *Jackson* controlling of this case, despite its concerns of the social worker's conduct, I find the Ohio Supreme Court's recent decision in *Jackson*, Slip Opinion No. 2018-Ohio-2169, distinguishable from this case.

{¶55} The issue in *Jackson* was

> whether a social worker's statutory duty to cooperate and share information with
>
> law enforcement regarding a child abuse investigation renders the social worker
>
> an agent of law enforcement for purposes of the Fifth and Sixth Amendments to
>
> the United States Constitution if the social worker interviews an alleged
>
> perpetrator.

*Id.* at ¶ 1.

**{¶56}** As the court stated in *Jackson*, "'whether someone is acting as an agent of law enforcement is dependent upon the unique circumstances of each case.'" *Id.* at ¶ 17, quoting *State v. Bernard*, 31 So.3d 1025, 1033 (La.2010). The *Jackson* court concluded that the social worker, based in part on the record in the case, was not acting as an agent of law enforcement when she interviewed the defendant. *Id.* at ¶ 21. The court explained,

> a social worker's statutory duty to cooperate and share information with law enforcement with respect to a child abuse investigation does not render the social worker an agent of law enforcement for purposes of the Fifth and Sixth Amendments to the United States Constitution when the social worker interviews an alleged perpetrator *unless* other evidence demonstrates that the social worker acted at the direction or under the control of law enforcement.

(Emphasis added.)

**{¶57}** As the dissent in *Jackson* noted (in agreeing with the majority) "R.C. 2151.421(G) and related statutory provisions do not categorically transform a children's services investigator into a law-enforcement agent." *Id.* at ¶ 41 (DeGenaro, J., dissenting). The specific facts of this case, however, lead to the conclusion that the social worker was acting as the functional equivalent of law enforcement. Those facts include: M.H.'s age, what was said (or more importantly not said) to M.H. and M.H.'s mother prior to questioning, and the social worker herself.

**{¶58}** The trial court's decision in this case was not based solely on whether the social worker was an agent of law enforcement or acted at the direction or under the control of law enforcement. The trial court also found that M.H.'s due process rights were violated and his statements were inadmissible under Evid.R. 403. I believe there was competent credible evidence in the record to support these findings.

{¶59} The defendant in *Jackson* was 31 years old at the time of the alleged rape; here, M.H. had just turned 13 years old at the time of the alleged incident and was still only 13 when he was interviewed by the social worker. The social worker testified that she told M.H.'s mother that the interview with M.H. would be "private" but that mother would not be allowed to be in the interview room with M.H. As the concurring opinion notes, "the word 'private' indicates that the nature and substance of the interview would not be shared."

{¶60} The other facts noted by the concurring opinion, specifically that the social worker testified that (1) she did not advise M.H. of the purpose of the interview; (2) she did not advise M.H. that the interview was voluntary or he was free to leave; and (3) she never told M.H. or his mother that the information he shared with her could be shared with law enforcement — also go against the voluntariness of M.H.'s statements. In fact, the social worker testified that she started out her interview with M.H. by asking him questions to build rapport and "didn't tell him anything to do with why he was there." M.H.'s mother testified that had she known about the purpose and nature of the meeting, she would have had an attorney present. Compare *Jackson*, where the social worker told the 31-year-old defendant that anything he said could be subpoenaed by the courts. *Id.* at ¶ 3. The social worker did not advise 13-year-old M.H. of the same.

{¶61} As mentioned, the investigating detective did not interview M.H. Detective Cottom was assigned to investigate the case a month and a half before the social worker interviewed M.H. The detective testified that she did not separately interview M.H. because the social worker had already interviewed him. This allowed the detective to circumvent normal procedural safeguards that an accused offender would usually have. In other words, this

allowed the detective to "use" the social worker to do the detective's investigation without ensuring the rights of the child.

{¶62} The social worker testified that she told the victim and her mother to make a police report. They made a police report and the social worker followed up by interviewing M.H. The social worker, who spent ten years working for the Atlanta police department as a patrol officer, general investigator, and homicide detective, additionally admitted that she would be interviewing M.H. on what could be criminal allegations. The social worker stated that because there was a "strong possibility" that the allegations were criminal in nature, she would turn over her report to the police. The detective, on the other hand, did not interview M.H. because the detective knew she could just use the report generated by the social worker.

{¶63} The state argued that M.H.'s age was relevant in that it alters the CCDCFS investigator's role in this case from investigating allegations, as in *Jackson*, to assessing the safety of both M.H. and the alleged victim. Perhaps that's true in some cases, but here the social worker testified that her purpose in interviewing M.H. was "to determine whether or not some inappropriate sexual behavior happened between the two of them and if anything criminal happened, then I pass that on to law enforcement." More troubling is the admission by the social worker that when she interviewed the alleged victim — prior to interviewing M.H. — neither the alleged victim nor the alleged victim's mother communicated any concerns about the alleged victim's safety.

{¶64} The trial court also excluded M.H.'s statements based on Evid.R. 403, which states that exclusion of relevant evidence is mandatory "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the

jury." Evid.R. 403(A). Again, there was competent, credible evidence that supports the trial court's findings.

{¶65} In light of the above and the specific facts of this case, I find the facts of *Jackson* distinguishable and would affirm the decision of the trial court.